**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**C & C PLYWOOD CORPORATION,
Respondent.**

**No. 19769.**

United States Court of Appeals
Ninth Circuit.

Sept. 10, 1965.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack, Hans J. Lehmann, Attys., N. L. R. B., Washington, D. C., for petitioner.

George J. Tichy, Spokane, Wash., for respondent.

Before BARNES and KOELSCH, Circuit Judges, and MATHES, Senior District Judge.

MATHES, Senior District Judge:

The National Labor Relations Board petitions to enforce its order of August 24, 1964, which directs among other things that respondent: "Upon request, bargain with Plywood, Lumber, and Sawmill Workers Union No. 2405, AFL-CIO, with respect to the institution of a premium pay plan for glue spreader crews and, if requested by said Union, rescind any plan which Respondent may have unilaterally instituted."

The order sought to be enforced is the culmination of Administrative proceedings which followed filing by the union of a complaint before the Board on July 31, 1963, charging that respondent, as employer, "has engaged in and is engaging in unfair labor practices" within the meaning of section 8(a), subsections (1) and (5) of the National Labor Relations Act [29 U.S.C. § 158(a) (1) and (5)], in that: "On or about May 20,

1963, the Employer unilaterally, and without agreement with representatives of its employees, changed the wages, rates of pay and conditions of certain of its employees at a time when such rates of pay, wages and conditions had just been incorporated in a signed contract with the Union and were not subject to renegotiation or change by either party."

Respondent conceded that at all times material to the proceeding, it was engaged in the business of processing and manufacturing plywood from green veneer at Kalispell, Montana; that since on or about August 28, 1962, the union had been the certified representative for purposes of collective bargaining of the employees involved and, as such, by virture of § 9(a) of the Act [29 U.S.C. § 159(a)], had been and is now the exclusive bargaining representative of all employees in that unit; that from September, 1962, until May 1, 1963, the union and respondent engaged in a number of bargaining sessions culminating in a signed collective-bargaining agreement, effective from May 1, 1963, until October 31, 1963, but remaining in full force and effect from year to year thereafter, absent notice of a desire to change; that since on or about May 20, 1963, without consulting the union, the respondent unilaterally, and over the objection of the union, instituted a group wage incentive plan affecting approximately one-fourth of the employees in the appropriate bargaining unit.

Respondent denied the unfair-labor-practice charge, and asked the Board to dismiss the complaint. Respondent's consistent position has been that the group wage incentive plan was instituted in the good-faith belief that the plan was permissible under the provisions of the collective-bargaining agreement and that, even if not expressly permitted, the only issue presented to the Board was a disagreement as to the proper interpretation of the contract. Thus respondent has contended throughout that the matter was not properly before the Board on an unfair-labor-practice charge.

The two articles of the collective-bargaining agreement relied upon by respondent are the following:

### "Article XVII

### "WAGES

"A. A classified wage scale has been agreed upon by the Employer and Union, and has been signed by the parties and thereby made a part of the written agreement. The Employer reserves the right to pay a premium rate over and above the contractual classified wage rate to reward any particular employee for some special fitness, skill, aptitude or the like. The payment of such a premium rate shall not be considered a permanent increase in the rate of that position and may, at sole option of the Employer, be reduced to the contractual rate at such time as the Employer feels that the employee no longer merits the premium, except that no present employee of the date of signing of this original Working Agreement shall suffer a wage reduction as a result of this Agreement.

\* \* \* \* \* \*

### "Article XIX

### "WAIVER OF DUTY TO BARGAIN

"The parties acknowledge that during negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter of collective bargaining, and that the understanding and agreement arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right and each agrees that the other shall not be obligated to bargain collectively with respect to any subject matter not specifically referred to or covered if this Agreement, even though such subjects or matters may not

have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement."

The Trial Examiner found that respondent acted in the good-faith belief that it was authorized by the above-quoted provisions of the collective-bargaining agreement to take the unilateral action it did with respect to the premium pay in question. The Examiner then concluded:

"General Manager Thomason's decision—so far as the record shows—was consciously reached within the framework of his firm's contract, as he construed it, and did not reflect a deliberate attempt to modify or terminate it. See United Telephone Company of the West, 1111 NLRB 779. The Board's decision in the cited case—with respect to circumstances substantially comparable—declared that:

"Regarding the question of which party correctly interpreted the contract, the Board does not ordinarily exercise its jurisdiction to settle such conflicts. As the Board has held for many years, with the approval of the courts; '* * * it will not effectuate the statutory policy * * * for the Board to assume the role of policing collective contracts between employers and labor organizations by attempting to decide whether disputes as to the meaning and administration of such contracts constitute unfair labor practices under the Act.' "

The Trial Examiner thereupon recommended to the Board:

"Upon these findings of fact and conclusions of law, and upon the entire record in the case, my recommendation is that the Board, pursuant to Section 10(c) of the National Labor Relations Act, as amended, dismiss the present complaint in its entirety."

The Board, with one member dissenting, reversed the Trial Examiner, observing in part:

"The Trial Examiner found that the dispute between the Union and Respondent involved only a disagreement as to the meaning of terms of a collective-bargaining contract and that the promulgation of the premium pay plan according to Respondent's understanding of those terms was not a violation of Section 8(a) (5). We disagree.

"In filing its unfair labor practice charge, the Union was complaining not of a violation of its contract with Respondent, but of the invasion of its statutory right as collective-bargaining representative of employees in the unit to bargain about any change in the terms and conditions of employment for such employees."

Because the union elected to file an unfair labor practice complaint with the Board, rather than to proceed in the courts, the question presented involves the power of the Board under § 10(a):

"The Board is empowered * * * to prevent any person from engaging in any unfair labor practice * * * affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * *." [29 U.S.C. § 160(a).]

The proceeding before us is, therefore, to be distinguished from cases involving suits originally instituted in the courts under § 301(a) of the National Labor Relations Act. [29 U.S.C. § 185(a); cf.: Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Smith v. Evening News Assn., 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); Retail Clerks Int. Assoc. v. Lion Dry Goods, Inc., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962); Local 174, Teamsters, etc. v. Lucas Flour Co., 369

U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) ; Dowd Box Co., Inc. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962) ; San Diego Bldg. Trades Council, etc. v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).]

We recently held in Square D. Company v. N. L. R. B., 332 F.2d 360 (9th Cir. 1964), that the Board has no jurisdiction to adjudge an unfair labor practice where "the existence of an unfair labor practice * * * is *dependent* upon the resolution of a preliminary dispute involving *only* the interpretation of the contract". [Emphasis in the original, 332 F.2d at 365–366.]

Although the Board contends that Square D. does not control our decision here, admittedly the majority of the Board found it necessary to "construe" the collective-bargaining agreement in order to find an unfair labor practice. Indeed, the Board majority "construed" the contract by looking back to negotiations presumably merged in the agreement, as well as to the provisions of the agreement itself, and by considering also the fact that the union made "prompt protest" against respondent's action, admittedly taken under what respondent conceived to be a proper interpretation of the agreement.

We note, moreover, that the rationale of the Board majority, in construing the contract as it did, was as unique as it was circuitous. The course of reasoning was that the provisions of the collective-bargaining agreement are "so contrary to labor relations experience" that the union should never have executed such a contract; and since the provisions in question should never have been agreed to by the union, it must be presumed that the union did not intend them, since the union's "prompt protest against Respondent's posting of the new wage schedule * * * belies any such intent".

The Board would distinguish the controversy here from that in Square D., by quoting the language of our opinion recognizing the jurisdiction of the Board in instances of "a controversy over the applicability or violation of a duty not only prescribed by the contract but also imposed directly by the Act, disregard of which would constitute an unfair labor practice". [Square D. Company v. N. L. R. B., supra, 332 F.2d at 364.] But we find no support for the Board's position in that language.

Where the disputed provisions of a collective-bargaining agreement do no more than affirmatively prohibit conduct already defined and forbidden by the Act as an unfair labor practice, the Board can never be ousted of jurisdiction, for the reason that the controversy would involve no more than a breach of these negative contract provisions—a violation of duty already "imposed directly by the Act", irrespective of the contract itself. Were it otherwise, it would be a simple matter to remove from the jurisdiction of the Board all unfair labor practice disputes, by the facile device of prohibiting in the collective-bargaining contract all unfair labor practices defined in the Act.

The disputed provisions of the collective-bargaining · agreement at bar clearly present quite a different situation from that just discussed. Here, the parties have arguably agreed affirmatively to permit conduct which, sans contract, the Act would admittedly condemn as an unfair labor practice. The resulting controversy then, as to whether the provisions of the contract positively sanction the action complained of, is a matter for arbitration where, as in Square D., the collective-bargaining agreement so provides, or for adjudication by the Courts; and hence is beyond the subject-matter jurisdiction of the Board. This is necessarily so because, under the circumstances at bar, the very existence of the alleged unfair labor practice is "*dependent* upon the resolution of a preliminary dispute involving *only* the interpretation of the contract." [Square D. Company v. N. L. R. B., supra, 332 F.2d at 365–366.]

Since the Board has no jurisdiction to enforce collective bargaining agreements as such, both reason and policy dictate that adjudication of dis-

putes, as to the scope of contractual rights and obligations, be by tribunals empowered to compel compliance with them. As declared in N. L. R. B. v. American National Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), "the Board may not, either directly or indirectly, * * * sit in judgment upon the substantive terms of collective bargaining agreements". [343 U.S. at 404, 72 S.Ct. at 829; see also: Dowd Box Co., Inc. v. Courtney, supra, 368 U.S. at 510–513, 82 S.Ct. 519; Square D. Company v. N. L. R. B., supra, 332 F.2d at 366; In re Morton Salt Co., 119 N.L.R.B. 1402, 1403 (1958); In re United Tel. Co. of the West, 112 N.L.R.B. 779, 781–782 (1955).]

Here, as in N. L. R. B. v. Nash-Finch Co., 211 F.2d 622, 45 A.L.R.2d 683 (8th Cir. 1954):

"It seems to us that what the Board has done, under the guise of remedying unfair labor practices, is to attempt to bestow * * * benefits which it believes the Union should have obtained but failed to obtain * * * as a result of its collective bargaining with the respondent * * *." [211 F.2d at 627.]

Undeniably, the specific controversy at bar is whether the respondent or the union has correctly interpreted the quoted provisions of Section A of Article XVII of the collective-bargaining agreement. Moreover, since the nature of the controversy is such that the existence or non-existence of an unfair labor practice does not turn entirely upon the provisions of the Act, but arguably upon a good-faith dispute as to the correct meaning of the provisions of the collective-bargaining agreement, the Courts have jurisdiction. [Square D. Company v. N. L. R. B., supra 332 F.2d 360.] Although this may in some cases unavoidably delay exercise of the Board's unquestioned jurisdiction under § 10(a) of the Act to control unfair labor practices affecting commerce [29 U.S.C. § 160(a)], such a rule will not operate to encroach upon that jurisdiction.

For the reasons stated, the Board's petition to enforce the challenged order is denied, and the matter is remanded to the Board with directions to vacate the order, and to dismiss the complaint and all unfair-labor-practice proceedings herein, for lack of the Board's present jurisdiction over the subject matter.