NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

KEYSTONE VALVE CORP., Respondent.

No. 71–1445

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Oct. 27, 1971.

---

* [1] Rule 18, 5th Cir. See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 431 F.2d 409, Part I (5th Cir. 1970).

1254

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Clifford Potter, Director, Region 23, N. L.R.B., Houston, Tex., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Thomas E. Silfen, Corinna Lothar Metcalf, Attys., N.L.R. B., Washington, D. C., for petitioner.

Thomas R. Beech, Houston, Tex., Clifford G. Shawd, San Antonio, Tex., for respondent; Butler, Binion, Rice, Cook & Knapp, Houston, Tex., of counsel.

Before GEWIN, GOLDBERG, and DYER, Circuit Judges.

GEWIN, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order finding the Keystone Valve Corporation (Company) in violation of section 8(a) (1) and (5) of the National Labor Relations Act [1] for refusing to recognize or bargain collectively with Millwrights Local Union 2232 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (Union) during the initial certification year.

The dispute focuses on whether the Company was justified in withdrawing from contract negotiations with the Union while eight (8) days remained in the initial year of the Union's certification as the bargaining representative for the Company's employees. The Trial Examiner and the Board found the Company's refusal to recognize or bargain collectively with the Union constituted an unfair labor practice in violation of section 8(a) (1) and (5) of the Act. We enforce.

The facts in this case are largely undisputed. On August 27, 1968, following a Board conducted election in which the Union received a majority of the votes, the Union was certified as exclusive bargaining agent for the Company's production and maintenance employees. After certification the parties met on 25 occasions between September 26, 1968 and August 19, 1969. During the fall of 1968 through the early spring of 1969 the parties exchanged substantially complete contract proposals and counter-proposals. Thereafter they negotiated and agreed tentatively on a substantial number of contract clauses dealing with a wide variety of topics.[2] Although there

1. 29 U.S.C.A. § 158(a) (1) and (5) (1965).

2. At the hearing the parties stipulated that tentative agreement was reached on the following topics: Recognition; Scope of Agreement; Business Agents and Union Officials; Strike and Lockouts; Probationary Employees; Holidays; Vacations; Funeral Leaves; Jury Service; Safety; Bulletin Boards; Change in Address, Telephone Number and Personal

Status; Rest Periods; Payment for Time Lost for Medical Attention Related to Injury Arising out of Employment; Equipment and Clothing; Nondiscrimination Because of Union Activity; Nondiscrimination Because of Race, Religion, etc.; Profit Sharing Plan; and Separability. In addition a preponderance of the evidence shows that during the first 24 sessions the negotiators also arrived at tentative agreement regarding the follow-

is some conflict in the evidence it appears that when the next to the last meeting of the parties took place on May 20, 1969, a tentative agreement had been reached on all substantial issues except arbitration, seniority, wages and duration of the contract.

Between May 20 and August 19 there were no negotiations. A meeting scheduled for June 5 was cancelled because Banks, the chief union spokesman, was hospitalized. After he left the hospital, Banks made efforts both directly and through the Federal Mediator to arrange further meetings. Banks wrote the Company's Secretary-Treasurer, Pettit, on July 21, 22, 28 or 29, and requesting that "this meeting be for a package of the remaining three items, wages, seniority and insurance." Pettit's secretary replied by letter of July 17 that company representatives were not available on the suggested dates because of vacations but could meet on July 23 or 24. Banks did not respond to this suggestion. However, a few days later, with the help of the mediator, arrangements were made for a meeting on August 19.

At the time of the scheduled meeting the Union's bargaining position did not appear particularly strong. A strike called in January 1969 in support of the Union's bargaining demands had been supported by only 30–35 out of 107 employees then in the bargaining unit. The strike lasted for one week.

After the strike the Union's efforts to have the Company replace its chief negotiator, Shawd, had been unsuccessful. At a bargaining session on January 29,

1969, the Union representative threatened action against the Company unless Shawd was replaced. The Company responded by filing an unfair labor practice complaint against the Union, but later withdrew the charge. In June 1969 Banks asked the Company for a meeting without Shawd and was told that the Company would not replace Shawd. After arrangements for the August 19 meeting had been made, 51 out of approximately 81 employees left in the bargaining unit signed a decertification petition and filed it with the Board's Regional office on July 29, 1969.

The Board found that in preparation for the August 19, 1969 meeting the Company representatives, Shawd and Pettit, concluded that in view of circumstances the Company would terminate its bargaining with the Union and cease to recognize the Union. The Union also reviewed its situation and concluded that they would accept the Company's terms on what they understood were the only three outstanding items, insurance, wages and seniority.

At the August 19 meeting the mediator opened the session noting that three topics remained open: wages, insurance and seniority. The Company representative then handed the Union representative a letter [3] indicating that the Company was withdrawing from the negotiations. The Union representative stated that the Union "accepts the Company's last firm proposal on these three items (still open) for a period of a 1-year contract from this date as discussed previously." The Company representative said "The letter shuts off need for further remarks." The Company represent-

---

ing topics: Shop Stewards; Hours of Work; Overtime and Premium Pay; Leave of Absence; Grievance Procedure; Production Standards; Installation of New Machinery, etc.; and orally, regarding Management Rights including provisions for Check-off.
F.N. #5, Trial Examiner's Decision.

3. The letter was addressed to Banks, dated August 18 and signed by Pettit reading as follows:

There is predominant evidence, known to both parties, that the Millwrights Local Union 2232 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO does not represent the majority of our bargaining unit employees; therefore, we find it inappropriate to resume or continue negotiations and believe it to be contrary to the intent of the Act to do so.

For these reasons, we respectfully withdraw from further negotiations.

ative refused to answer any further questions and the meeting ended.

The Union brought this unfair labor practice proceeding. After a hearing the Trial Examiner found, and the Board approved, that the events at the August 19 meeting as well as during the earlier negotiations did not result in agreement on seniority, wages or duration of the contract. The Board therefore found that the Company had not violated the Act by refusing to execute a collective-bargaining agreement. However the Trial Examiner found, and the Board approved, that the Company violated section 8(a) (1) and (5) of the Act by refusing since August 19, 1969 to recognize or bargain collectively with the Union.

The Company argues here that under Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954) they have bargained in good faith for a "reasonable period—about one year"—and further that the "facts in this case present unusual circumstances" justifying the Company's refusal to bargain. We disagree.

The Company acknowledges the importance of allowing the Union a reasonable period of time following certification to negotiate a collective bargaining agreement with the Company. But the Company argues that the decision in *Brooks* and the cases following, particularly N.L.R.B. v. Alva Allen Industries, Inc., 396 F.2d 310 (8th Cir. 1966), do not require 365 days in order to be a "reasonable period."

We feel that the Company overlooks the importance of providing a union whose representative status has been certified by the Board with not only a "reasonable time" to bargain but also a fixed minimum time during which the effort to reach an agreement will not be frustrated by the Company's refusal to bargain, except in unusual circumstances.

In *Brooks* the employer had refused to bargain where shortly after certification the union lost, without the employer's fault, the majority of its membership. The employer there contended that whenever an employer is presented with evidence that his employees have deserted their certified union, he may forthwith refuse to bargain. Speaking for the court, Mr. Justice Frankfurter rejected the argument.

> If the employees are dissatisfied with their chosen union, they may submit their own grievance to the Board. If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit. Although the Board may, if the facts warrant, revoke a certification or agree not to pursue a charge of an unfair labor practice, these are matters for the Board; they do not justify employer self-help or judicial intervention. The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. [footnotes omitted]

348 U.S. at 103, 75 S.Ct. at 181.

The Court cited with approval the Board's rule that "A certification, if based on a Board-conducted election, must be honored for a 'reasonable' period, ordinarily 'one year,' in the absence of 'unusual circumstances.'" 348 U.S. at 98, 75 S.Ct. at 178.

The language used by courts which have considered this problem in recent years indicates a substantial number of courts agree that absent "unusual circumstances" the employer must bargain in good faith for one year after certification, following an election, even though a majority of the employees of the company have repudiated the union. N.L.R.B. v. Holly-General Co., Division of Siegler Corp., 305 F.2d 670, 675 (9th Cir. 1962); N.L.R.B. v. U. S. Sonics Corp., 312 F.2d 610, 616 (1st Cir. 1963); N.L.R.B. v. International Shoe Corp. of

Puerto Rico, 357 F.2d 330, 331 (1st Cir. 1966). Cf. N.L.R.B. v. Sharon Hats, Inc., 289 F.2d 628, 631 (5th Cir. 1961); N.L.R.B. v. Satilla Rural Electric Membership Corp., 322 F.2d 251, 253 (5th Cir. 1963); N.L.R.B. v. Certain-Teed Products Corp., 387 F.2d 639 (5th Cir. 1968).

Moreover a number of courts in considering disputes which did not actually arise within the year following certification have approved the one year rule. N.L.R.B. v. Miami Coca-Cola Bottling Co., 382 F.2d 921, 923 (5th Cir. 1967); N.L.R.B. v. Rish Equipment Co., 407 F. 2d 1098, 1100 (4th Cir. 1969); N.L.R.B. v. C & C Plywood Corp., 413 F.2d 112, 115 (9th Cir. 1969). Cf. N.L.R.B. v. Louisiana Bunkers, Inc., 409 F.2d 1295, 1299 (5th Cir. 1969). Some courts have referred to the one year rule as an "irrebuttable presumption of majority status" e. g., N.L.R.B. v. Gulfmont Hotel Company, 362 F.2d 588, 589 (5th Cir. 1966); Lodges 1746 & 743, International Association of Machinists and Aerospace Workers, AFL–CIO v. N.L.R.B., 135 U.S.App.D.C. 53, 416 F.2d 809, 811 (1969); Bally Case and Cooler, Inc. of Delaware v. N.L.R.B., 416 F.2d 902, 904–905 (6th Cir. 1969). Other courts have termed the one year rule a "conclusive presumption in the absence of special circumstances." Ingress-Plastene, Inc. v. N.L.R.B., 430 F.2d 542, 546 (7th Cir. 1970); Fremont Newspapers, Inc. v. N. L. R. B., 436 F.2d 665, 671 (8th Cir. 1970).[4]

■ We are persuaded by the Board's argument that the fundamental purpose

of the certification year rule would be thwarted if the year could be modified or truncated absent a showing of "unusual circumstances." If employers could determine, based on *their* assessment of the union's representative standing and *their* analysis of the process of negotiations, that employee rights would best be effectuated by a termination of bargaining, the Board would then be required to decide, on a case by case basis, whether the particular employer acted reasonably and in good faith. All the evils which the rule was designed to prevent—dilatory challenges to representative status, inhibiting and destructive time pressures, administrative uncertainty—would be resurrected and encouraged.

We are of the opinion that a year is a reasonable time to permit a newly certified union to reach an agreement with the company whose employees the union represents. But in addition, a firm one year minimum requirement for good faith bargaining, in the absence of unusual circumstances, provides an understandable and easily enforceable standard. Such a standard permits both parties to adjust their bargaining strategies with regard to a day certain when the insulated bargaining period will terminate and protects the last weeks of the certification year, which may well be the most fruitful in producing a collective bargaining agreement.[5]

The Company here has cited only one case, and the court has been unable to find any other, in which the "reasonable period, ordinarily one year" mentioned in

---

4. There are cases where courts in dicta have appeared to suggest that a minimum of one year's time might not be required in order to be "reasonable", N.L.R.B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1090 (8th Cir. 1969) [Irrebutably presumed for a reasonable period, ordinarily one year after certification]; N.L.R.B. v. Frick Company, 423 F.2d 1327, 1330 (3d Cir. 1970) [the reasonable time in which its majority status may not be challenged is ordinarily one year]; General Electric Co., Battery Products Capacitor Department v. N.L.R.B., 400 F.2d

713, 727 (5th Cir. 1968) [for approximately one year after the union's certification * * * a union majority was uncontestable at law absent special circumstances].

5. The facts in this case strongly suggest that in view of the Union's decision to accede to the Company's position on the three remaining topics open for bargaining, an agreement might well have been reached during the final week of the certification year, but for the Company's refusal to bargain.

*Brooks* has been held to be satisfied by less than one calendar year. In N.L.R.B. v. Alva Allen Industries, Inc., 369 F. 2d 310 (8th Cir. 1966), the court found that having bargained in good faith until only eleven days prior to the end of the certification year, the company had bargained for "about one year" and under the circumstances of the case, it was held that they had bargained for a "reasonable period." 369 F.2d at 310. However the circumstances in that case were that the union had been lethargic in negotiating for eight months and had failed for three months to resume negotiations. Further all the members in the unit had been replaced as a result of a strike and the union had indicated that it was unwilling to represent the strike breakers. Finally, in an effort to forestall a representation election at the close of the certification year, the union had given the company a "blank check" to write a contract covering employees in the unit over which the union had no interest (since all were strike-breakers) by relinquishing any demand for union security, re-employment of striking workers or even preferential hiring of strikers for future vacancies. The court held that these facts also constituted "unusual circumstances" permitting a shortening of the "reasonable period, ordinarily one year," following certification.

In the present case the Trial Examiner and the Board found the facts here distinguishable from those in *Alva Allen* and not comparable to the unusual circumstances referred to by the Supreme Court in *Brooks*.[6] Accordingly, the Board found that the Company's refusal to recognize and bargain with the Union during the certification year constituted an unfair labor practice. Upon examination of the record and briefs in this case we find that the Board's conclusion is supported by substantial evidence.

We agree that the facts as found by the Board do not amount to "unusual circumstances" sufficient to justify a shortening of the good faith bargaining requirement during the year following certification. There is nothing unusual about the fact that only eight days remained in the certification year. At some point in time all union certifications will be 357 days old. The Union here did not abandon the negotiations as in *Alva Allen*, although they were delayed due to the illness of the Union representative and the Company's vacation schedule.

The Union's threats against the Company in their effort to replace the Company negotiator prompted proper action in the form of a filing of an unfair labor practice charge. However the Company later withdrew the complaint and five months of negotiations had followed. The suggestion by Banks in June that the Company replace its negotiator did not diminish the Company's willingness to set further dates for negotiations in July.

Finally the filing of the petition for decertification by the employees did not destroy the bargaining status of the certified Union, nor amount to an "unusual circumstances." N.L.R.B. v. Holly-General Co., Division of Siegler Corp., *supra*. The question is not whether the employer in good faith doubts the union's continued representative status; the employer is not relieved of its duty to bargain during the certification year even when it is shown that a majority of the employees may have defected from the union. Holly-General Co., *supra*; N.L.R.B. v. Satilla Rural Electric Membership Corp., *supra*; N.L.R.B. v. Louisiana Bunkers, Inc., *supra*.

The Company argues "This case is all about eight (8) days." More accurately stated, the case is about the refusal of the Company to bargain for eight (8)

---

6. *I. e.,* "(1) the certified union dissolved or became defunct; (2) as a result of a schism, substantially all the members and officers of the certified union transferred their affiliation to a new local or international; (3) the size of the bargaining unit fluctuated radically within a short time."
348 U.S. at 98–99, 75 S.Ct. at 178.

days. Neither the Board nor this court intimates that the Company was under any duty to execute a contract; but it was under a duty to bargain. The Board's findings are supported by substantial evidence on the record considered as a whole and the Board's order will therefore be enforced.